# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 13, 2013 Session

## STATE OF TENNESSEE v. MICHAEL PRESSON

**Direct Appeal from the Circuit Court for Madison County**
**No. 10-202    Roy B. Morgan, Jr., Judge**

---

**No. W2012-00023-CCA-R3-CD  -  Filed April 24, 2014**

---

A Madison County jury convicted the Defendant, Michael Presson, of ten counts of attempted aggravated sexual battery, one count of aggravated sexual battery, and eleven counts of rape of a child.  The trial court sentenced the Defendant to an effective sentence of thirty-five years of confinement.  On direct appeal from his convictions, the Defendant contends that: (1) the evidence presented at trial was insufficient to sustain his convictions; (2) the trial court erred when it refused to admit into evidence the medical record for one of the victims; (3) the trial court violated Tennessee Rule of Evidence 615 by allowing the State's designated witness to be present during the victims' testimony, without requiring the designated witness to testify first; (4) the State improperly used an exhibit and commented on a jury questionnaire during closing arguments, violating the Defendant's Sixth Amendment right to a fair trial; (5) the trial court improperly instructed the jury as to the *mens rea* elements of the crimes; (6) the trial court erred when it imposed consecutive sentences; and (7) the trial court erred when it placed the victim's medical records under seal and denied the Defendant the opportunity to review the records.  After a thorough review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ALAN E. GLENN and JEFFREY S. BIVINS, JJ. joined.

David L. Raybin, Nashville, Tennessee (on appeal), and Joe H. Byrd, Jr., Jackson, Tennessee (at trial), for the Appellant, Michael Presson.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; James G. Woodall, District Attorney General; Rolf G.S. Hazlehurst, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

#### A. Trial

This case arises from the Defendant's rape and sexual battery of two minor girls during the period of time from 2007 to 2009. A Madison County grand jury indicted the Defendant in April 2010 for twenty-two counts of aggravated sexual battery, sixteen counts of rape of a child, two counts of sale, loan or exhibition of material harmful to minors, and one count of indecent exposure with respect to one of the victims, T.B.[1] The indictment also charged the Defendant with three counts of sexual battery with respect to the other victim, S.W.

At trial, the following evidence was presented: S.W. testified that she was fifteen years old at the time of trial and that she has been friends with T.B., the other victim, for "a long time." She testified that she also knew the Defendant's grandson and the Defendant, through her father. S.W. testified that she met the Defendant in the summer of 2009 and that the Defendant asked her to mow his yard. She started mowing his yard every two weeks that summer. At some point, the Defendant invited her to swim in his pool after mowing the yard. S.W. said that one day she was in the pool with the Defendant, and he "started tickling [her], and he touched [her] in inappropriate places." S.W. demonstrated for the jury that the Defendant touched her breasts, and she stated that it made her feel uncomfortable. During another "incident" in the pool, she recalled that the Defendant "slapped [her] on the butt" as she was getting out of the pool.

S.W. testified about another incident that happened while she and the Defendant were fishing together. She recalled that the Defendant was standing outside the boat, in the water, and that when he tried to get back into the boat, he reached in and touched S.W. "between [her] legs." S.W. testified that she mowed the Defendant's yard one more time after the fishing trip. She stated that she reported the incidents with the Defendant to the sheriff's department after T.B. came forward.

On cross-examination, S.W. testified that she spoke with Lieutenant Felicia Stacy at the sheriff's office on July 29, 2009. When asked about her statement, S.W. agreed that she had told Lieutenant Stacy that "nothing" had happened between her and the Defendant on the fishing trip. She stated that her mother was present when the incidents occurred in the Defendant's pool.

---

[1] It is the policy of this Court to refer to the minor victims by their initials only.

T.B. testified that she was fourteen years old at the time of trial and that she and S.W. knew each other from school. T.B. testified that the Defendant "used to be" a family friend and that she met him the summer before her seventh grade year in school. T.B. said that her mother had worked for the Defendant and that the Defendant, occasionally, would pick T.B. up from school. T.B. testified that she used to see the Defendant "a lot," stating that she and the Defendant would go out to eat together, go hunting together, and that she would "stay the night" at his house. T.B. estimated that she spent the night at the Defendant's house "over a hundred" times.

T.B. testified that she would normally go to the Defendant's house on a Friday night, and he would "give [her] a bath," and she "would have to sleep in the bed with [the Defendant]." When giving her a bath, the Defendant would "wash [her] with a wash rag" on her "breasts and [her] private area." T.B. indicated to the jury that her "private area" was her genital area. When asked how the Defendant would wash her genital area, T.B. responded "[h]e wouldn't go inside the hole [of the vagina]; he would go like on the inside of like the walls" and stated she was referring to the vaginal lips. T.B. stated that after the Defendant washed her, they would go lay in bed together, and that the Defendant would use a razor to shave her legs and her private area. She recalled that the Defendant told her that shaving would prevent her from "getting an infection."

T.B. testified that she slept in the same bed as the Defendant. She stated that the Defendant gave her a shirt cut off above her waist to wear and that he would wear underwear. She recalled that there were two other bedrooms in the house, but that she slept in his room because he told her there had been "break-ins" in the neighborhood. T.B. stated that, while lying in bed, the Defendant would "wrap his arm around [her]," and he would touch her breasts. T.B. recalled the night of August 11, 2007, when she spent the night at the Defendant's house while her parents went out. She stated that the Defendant bathed her that night and penetrated her when he washed her. He also touched her breasts when they were in bed together.

T.B. testified that the incidents with the Defendant "happened every time that [she] went over [to his house]," but that she wrote down the dates for each of the incidents she could remember "for sure" and for which she could prove why she was at his house. T.B. recalled that on or about September 28, 2007, at the Defendant's house, the Defendant took her clothes off and put her in the bath, and touched her breasts and private parts. She recalled he "went inside the lips" of her vagina, but did not "go in the hole." T.B. testified that she and the Defendant went hunting in October 2007, and she spent the night at the Defendant's house. On that occasion, she recalled he washed her body in the bath and then put his arms around her when they were in his bed. On or about December 7, 2007, T.B. recalled that the Defendant gave her a bath and when he washed her, he put "his fingers and the wash rag

3

inside of the lips [of her vagina] but not inside the hole." She said they slept in his bed together that night and the Defendant touched her breasts while they were in his bed. T.B. stated that, under the same circumstances, the Defendant touched her vagina and breasts on or about December 15, 2007, March 15, 2008, March 21, 2008, July 4, 2008, August 8, 2008, November 7, 2008, November 14, 2008, November 21, 2008, January 17, 2009, February 14, 2009, February 28, 2009, and March 7, 2009.

T.B. testified that on April 18, 2009, the Defendant showed her Playboy magazines and a vibrator. She testified that he had the Playboy magazines on his headboard by his bed, and he flipped through the magazines in front of her. She stated that he pulled the vibrator out of a dresser drawer and asked T.B. if she wanted to see it. T.B. stated that the vibrator was a white, creamy color and that it was "long and had a point on the end, and there was a switch on the top of it."

T.B. testified that, on or about May 29, 2009, she and the Defendant got into an argument over her cellular phone while they were lying in his bed. She said the Defendant "got mad" because she was sending text messages on the phone, and he tried to take the cellular phone away from her. T.B. stated she threw the phone across the room, and the Defendant got mad at her.

T.B. recalled that on July 10 or July 11, 2009, she was in her bathing suit at the Defendant's house and got stung by a bee on her "butt." T.B. recalled that the Defendant called her mother and asked what he should do about the bee sting. She stated that her mother told the Defendant to give T.B. a Benadryl, but the Defendant said he could not find any. Instead, T.B. recalled that the Defendant pulled her bathing suit aside and put his mouth "on [her] butt. . . where the bee sting was." She stated it was his "lips" that came into contact with her.

T.B. testified that on or about July 17, 2009, she and the Defendant went to a cabin belonging to the Defendant's friend, Max Warren. She stated that she and the Defendant arrived at the cabin first, and Mr. Warren and his grandson arrived an hour later. When she and the Defendant first arrived, the Defendant turned on the television to a pornography channel. T.B. said she did not want to watch pornography and tried to get up and leave, but the Defendant told her to "come back and sit down" and only turned off the pornography when he saw Mr. Warren arrive.

T.B. identified pictures of the outside and inside of the Defendant's house, and the trial court entered the photographs into evidence. T.B. identified a photograph of the dresser where the Defendant put the vibrator after he showed it to her, as well as a photo of the Defendant's headboard where he kept the Playboy magazines. She also identified pictures of the electric razor the Defendant used to shave her, the shirt she wore to sleep in his bed,

4

the disposable razor he used to shave her legs, the Playboy magazines, and the Defendant's underwear that he wore to bed.

T.B. testified that she did not tell anyone about the incidents until she told her mother the summer before her eighth grade year. She stated that, during her seventh grade year, she told her boyfriend about the incidents, but she did not reveal the Defendant's identity to her boyfriend. T.B. said that her boyfriend told his mother, who went to the principal, who then called T.B.'s mother. She recalled she told her boyfriend that she "had been touched by somebody." In the principal's office, T.B. "Basically just said that [she] was fine about it so that everything would be dropped and we wouldn't – [she] wouldn't get in any trouble. . . ." When asked why she would lie to the principal, T.B. explained that she lied to the principal because she "just wanted everything dropped and [she] didn't want to have to go through all this." T.B. said that the summer before her eighth grade year she knew that the Defendant was going to begin picking her up from school again, and she "didn't want to be around him anymore," so she told her mother what had happened.

T.B. testified that, when she told her mother about the incidents with the Defendant, they went over to S.W.'s house and talked to a law enforcement officer. The next day, T.B. gave a statement to Lieutenant Felicia Stacy at the sheriff's department. T.B. recalled telling Lieutenant Stacy about the razors, Playboy magazines, the Defendant's underwear, and the shirt she slept in at the Defendant's house; the trial court entered all of these items into evidence.

T.B. testified about an incident when she and the Defendant went deer hunting. T.B. recalled that, while she and the Defendant were in a deer stand, the Defendant made her "sit on his lap facing him, and he was kissing [her] and told [her] that's the way that [she needed] to kiss [her] boyfriend."

On cross-examination, T.B. testified that she gave two statements to Lieutenant Stacy, one on July 29, 2009, and the other on August 1, 2009. T.B. affirmed that everything she told Lieutenant Stacy was true and accurate. She agreed that she told Lieutenant Stacy that the Defendant did not put his penis inside of her and that he did not "try to put his finger or anything else inside of [her]." T.B. testified about the instance during which she told her boyfriend about the inappropriate touching in October 2007, and was later called to the principal's office about what she had said. T.B. agreed that she told the principal that she had "[done] this to get attention and sympathy." T.B. also agreed that she had said a person named "Daniel" had raped her, but it was a "random" name she had picked "out of the air." She said she did not identify a specific person.

T.B. testified that, in her July 29 statement, she told Lieutenant Stacy that it was the Defendant she was talking about when she made her prior allegation to her boyfriend. She

5

testified that she told Lieutenant Stacy that she had only disclosed being "molested or raped" by the Defendant to her boyfriend and her mother. T.B. stated that her boyfriend would not know everything that had happened between her and the Defendant, because she was not sure she had spoken to her boyfriend during the month of July 2009 when the Defendant's acts were still ongoing. When shown a document containing the phone records for the Defendant's landline telephone, T.B. agreed that, according to the phone records, a call had been placed from the Defendant's phone line to T.B.'s boyfriend's phone. T.B. also testified that she did not remember if she had communication with anyone on her cellular phone during the July 29 and August 1 interviews with Lieutenant Stacy.

When asked about her statement to Lieutenant Stacy that the Defendant had not put anything inside her "private parts," T.B. explained that she told Lieutenant Stacy that the Defendant had not put anything inside of her because "[she] was confused as to what [Lieutenant Stacy] was asking [her]." T.B. reiterated that the Defendant had put his fingers "inside the lip [of her vagina], but not inside the hole" and stated that the genital area was hard for a twelve-year-old to understand and describe.

T.B. reiterated that the Defendant asked her if she wanted his vibrator during the same weekend they went to Mr. Warren's cabin. She stated that was "the last time" she went to the Defendant's house.

T.B. testified that she was grounded as a result of the exchange between her and the Defendant over her cellular phone use at his house. She explained that the Defendant told her parents that she threw her cellular phone and that she had pushed him. As a result, her parents grounded her for the summer. T.B. agreed that being grounded meant her having to forego a concert she wanted to attend. She agreed that she did not like missing the concert or having her cellular phone taken away. T.B. confirmed that it was within one or two days of being grounded and having her cellular phone taken away that she told her mother about the incidents involving physical contact with the Defendant and provided interviews with Lieutenant Stacy.

T.B. testified that she was "real familiar" with the inside of the Defendant's house, and that she had full access to the house. T.B. agreed that she referred to the Defendant as "grandad."

T.B. agreed that she underwent physical examinations by Dr. Tara (Donnelly) Pedigo in April 2009 and by Dr. Lisa Piercy in August 2009. The records from both examinations were admitted into the record. T.B. testified that she told Dr. Pedigo that she was not "active sexually" because she was not having sex at the time. T.B. could not remember, but did not deny, that she told Dr. Piercy that "a family friend fondled her with his hand o[n] top of my panties sometimes and on my private during baths[.]" T.B. reiterated that she "didn't

6

understand everything" she was being asked and that she thought "sexual activity" meant having sex, which she was not. T.B. further stated that she did not understand what was meant by "penetrating" and that she was confused in her interview with Lieutenant Stacy. She said she was similarly confused at trial about the meaning of the word "penetrating."

On re-direct examination, T.B. agreed that she had "never" said the Defendant had touched her with his penis. She reiterated that the Defendant put his lips on her buttocks to suck out a bee sting. T.B. agreed that she "denied sexual activity of any kind" during her examination with Dr. Pedigo in April 2009, and stated that was before she came forward with her allegations against the Defendant.

Lieutenant Felicia Stacy testified that she was an investigator with the Madison County Sheriff's Department. She agreed that she was assigned this case concerning possible child sexual abuse. She stated that she conducted an interview with both of the alleged victims, S.W. and T.B., and that after speaking with them, she prepared a search warrant for the Defendant's home. Lieutenant Stacy stated that she was looking for specific items in the Defendant's home that T.B. had mentioned during her interview. Lieutenant Stacy said she was looking for "a white-colored, cream-colored vibrator; was looking for a white shirt that was cut off below the chest area . . .; I was looking for any Playboy magazine; I was looking for any disposable razors, was looking for a specific outfit that [T.B.] described, a blue jean outfit[.]"

Lieutenant Stacy testified that, during the execution of the search warrant, she found a vibrator, a white shirt that had cutoff sleeves and was cutoff on the bottom, some Playboy magazines, three blue disposable razors, an electric razor, a razor charger and a cellular telephone. Lieutenant Stacy testified that the vibrator and the cutoff t-shirt were found in a dresser near the master bedroom, and that the Playboy magazines were found in the headboard of the bed in the master bedroom. She stated the electric razor was found in the master bathroom on top of the sink. She testified that the items listed in the search warrant were found in the places T.B. had indicated.

On cross-examination, Lieutenant Stacy testified that she had written a list of potential interviewees, and she agreed that she had not interviewed some of the people on the list.

Dr. Lisa Piercy testified that she was a child abuse pediatrician and had been practicing in that field since 2005. She testified that she worked primarily at the Child Advocacy Center in Jackson, Tennessee. Dr. Piercy stated that she saw T.B. on August 21, 2009, after T.B. was referred to her by the Department of Children's Services for alleged child sexual abuse. Dr. Piercy stated that she interviewed T.B. and her mother to obtain T.B.'s medical history and that she also conducted a physical examination on T.B. Dr. Piercy said she spoke with T.B. and her mother together, then to T.B. alone, and then to T.B.'s

7

mother alone. Dr. Piercy recalled that T.B. said she was there because she had been raped. T.B. told Dr. Piercy that the conduct had been occurring for approximately two years. T.B. told Dr. Piercy that a "family friend," whom she identified as the Defendant, had "fondled her with his hand on top of [her] panties sometimes and on [her] private during [her] baths." T.B. said that she was ten years old when it first happened and that the most recent occurrence was during the summer of 2009.

Dr. Piercy testified that T.B.'s physical exam was "on the whole normal," meaning her genitalia was "fine" and there was "nothing wrong with her." Dr. Piercy stated that her physical findings from T.B.'s examination were "consistent" with what T.B. reported had happened, because T.B. had reported being touched on the outside of her panties, which would not cause trauma. She said that being touched on the inside or outside of the lips of her vagina would also not cause trauma. Dr. Piercy stated there was nothing abnormal about T.B.'s pubic hair. Dr. Piercy testified that T.B.'s medical records contained a prior diagnosis of oppositional defiant disorder ("ODD").

Dr. Piercy testified that disclosure of child sexual abuse is the process of a child telling what abusive event has happened. She said, typically, preteens or younger teenagers will either "come straight out and tell all" that has happened to them, or "test the waters" by telling a little bit of the story at a time. She explained that the child might also tell the whole story of the abuse but change some of the details to gauge the reaction. Dr. Piercy stated that some children tell someone other than their primary caregiver initially to see how the secondary person reacts. Dr. Piercy stated that T.B.'s accusation of rape and the subsequent recant was consistent with the behavior of a sexually abused child.

On cross-examination, Dr. Piercy agreed that it is "possible" for a child with ODD to falsely accuse someone of rape.

On re-direct examination, Dr. Piercy testified that the she had seen children who had been sexually abused display behaviors consistent with those attributed to ODD.

Max Warren testified that he had known the Defendant about twenty-five years and that he had seen T.B. four or five times. He recalled that he, his grandson, the Defendant, and T.B. had gone to his cabin in July 2009. Mr. Warren agreed that he arrived at the cabin after the Defendant. He agreed that the television in his cabin has access to the Playboy channel, but he stated that there is a lock on this channel to prevent kids from watching it. He stated that only he and his father have the code to unlock it.

On cross-examination, Mr. Warren stated that the Playboy channel is "supposed to be locked out" because of his grandson, and it stays locked "90 percent of the time." He stated that, when he arrived at the cabin, the Defendant was unloading groceries from his car.

8

While the television was on, it was not on the Playboy channel.

Donna Nelson testified that she was a special agent forensic scientist and employed by the Tennessee Bureau of Investigation ("TBI"). She was qualified as an expert in the field of DNA analysis. Ms. Nelson testified that she received the evidence collected in this case from the Madison County Sheriff's Department. She stated that she also received samples of T.B.'s and the Defendant's DNA. Ms. Nelson testified that she tested the disposable razor and found a DNA profile partially matching that of T.B.'s.

For the Defendant, Don Bell testified that he had known the Defendant for forty to forty-five years. He said their main connection was "outdoors, hunting, and fishing." Mr. Bell recalled that, in the summer of 2009, the Defendant and a "female child" came to fish in the lake behind Mr. Bell's house, and the Defendant introduced the child as S.W. Mr. Bell testified that he spoke to the Defendant after they finished fishing and that the Defendant was dry, as if he had not been in the lake. He stated that S.W.'s demeanor was normal.

C.O. testified that he knew T.B. from school. He stated that, in 2008, T.B. made a claim to him that she had been raped by someone at school, and he told the school principal. C.O. said T.B. then changed her story and said it was the Defendant. He said the principal asked him to name the student that T.B. had originally identified as the person who raped her, and C.O. showed the principal his picture in the yearbook. C.O. recalled that the school then conducted an investigation, but nothing came of it. C.O. testified that he knew T.B. for one year and that she was "[n]ot that truthful really."

Bobby McLaughlin testified that he was the principal at Jackson Christian School in 2008 and 2009 when T.B. was a student there. Mr. McLaughlin stated that he received a phone call from C.O.'s mother about the accusation made by T.B to her son against "another student." Mr. McLaughlin stated that he brought T.B., along with her mother and a guidance counselor, into his office to question her about the "rumor" he had heard. After he questioned her about the details, T.B. admitted that she had "made the story up." Mr. McLaughlin said that, based on his dealings with T.B., he would "not trust her with the allegations without following up extensively."

Dr. Tara Pedigo testified that she was a pediatrician at the Jackson Clinic and that she saw T.B. on April 10, 2009. Dr. Pedigo interviewed T.B. and her mother for T.B.'s medical history, and she learned that T.B. had accused a boy at school of raping her. She also learned that T.B. was taking Zoloft for depression and ODD and was being treated at Pathways. Dr. Pedigo learned from T.B.'s mother that the treatments were not working for T.B. and that she was getting "worse and worse." Dr. Pedigo testified that she examined T.B.'s genitalia and inquired about sexual activity. T.B. "denie[d] sexual activity of any kind" and the exam of her genitalia produced normal results.

On cross-examination, Dr. Pedigo agreed that she had noted in her records, "[T.B.'s] mother states that T.B. has been very stressed. She states that [T.B.] worries about everything. When T.B. first started the Zoloft, it was mostly for feelings of sadness." Dr. Pedigo agreed that sexual molestation could cause depression.

Dr. Robert Kennon testified that he was a licensed psychologist in Jackson, Tennessee, and that he primarily performed forensic psychological evaluations related to legal issues. He testified that he had evaluated children who had been sexually abused. Dr. Kennon testified as an expert witness in the field of forensic psychology. Dr. Kennon testified that he was familiar with ODD and said that related behaviors are hostile behaviors, problems with aggression, and generic resistence to authority. Dr. Kennon testified that in interviewing children to determine whether or not the child had been a victim of sexual abuse, he had seen a lot of false reports of abuse, and he noted that the false reports are often made to "gain an advantage."

Dr. Kennon went on to discuss the characteristics and behaviors of sexually abused children and children with ODD. He stated that children with ODD often display behaviors that show the child is actively defying authority, and that they are good at manipulating the system. Dr. Kennon testified that he was in the courtroom when the victims testified, and he stated that, while he did not evaluate T.B. personally, the diagnosis for a child with ODD is the opposite diagnosis to that of a child who has been sexually abused. He stated that T.B.'s testimony lacked detail and that she did not testify to several of the factors related to sexual abuse. He stated that her responses sounded "rote" and "repetitious" and lacked the detail he would expect to hear from an abuse victim.

On cross-examination, Dr. Kennon agreed that he was not evaluating children at the time of trial. He stated that he had performed evaluations in three to four hundred cases in the year leading up to this trial. Dr. Kennon agreed that if a child is "repetitiously abused" over a period of years, it would be possible that the "information would blur together" for that child.

On redirect-examination, Dr. Kennon testified that sexual abusers do not typically abuse their victims in the presence of others and that it is much more common for the abuser to isolate the victim. He testified that it would be "odd" for the abuser to a give a house key to the parent of a victim.

On recross-examination, Dr. Kennon agreed that it would be important for an abuser to win trust with a victim or with the victim's parents to give the abuser access to the child.

At the close of proof, the jury convicted the Defendant of ten counts of attempted aggravated sexual battery, eleven counts of rape of a child, and one count of aggravated

10

sexual battery.[2]

## B. Sentencing

The trial court held a sentencing hearing on June 29, 2011, during which the following evidence was presented: Tracy Shotz testified that she was a licensed clinical social worker with specific expertise in working with children who have been physically and sexually abused. She testified that she met with T.B. during the course of her work at Quinco Mental Health Center in January 2010. Ms. Shotz stated that she discussed the abuse with T.B. and that, based on reports from T.B. and T.B.'s mother, Ms. Shotz learned that T.B. had shown significant declines in her behavior and her grades. T.B. also presented many symptoms that are "right on with a child who has been sexually abused." She testified that T.B. was very "distraught" when she first came to therapy, but she participated actively.

Ms. Shotz recalled that T.B. felt betrayed by the Defendant and that she was fearful and felt unsafe, "like she was being stalked." Ms. Shotz testified that T.B. felt she was not safe, and that the family decided to move from the area because T.B. did not feel safe in her day-to-day environment. She recalled that T.B. regarded the Defendant as a family member and thus the Defendant's abuse created a sense of distrust for T.B. Ms. Shotz said that the time T.B. attempted to tell "somebody" about the physical contact, and the fact that nothing came of that, also contributed to her feelings of distrust. Ms. Shotz also discussed T.B.'s depression and T.B.'s feelings of anger, another symptom indicative of a child who had been sexually abused.

On cross-examination, Ms. Shotz agreed that back-talking, anger, and depression are all symptoms of ODD. She stated she had not treated T.B. for fifteen months.

On redirect examination, Ms. Shotz testified that ODD is a long-lasting diagnosis that is linked to depression. She stated that ODD is also linked to a person who had been sexually abused by an authority figure.

On recross-examination, Ms. Shotz testified that she did not agree with Dr. Kennon's testimony that the typical profile of a sexually abused child is completely opposite to that of a child with ODD. Ms. Shotz stated that there are similar overlapping behaviors in those two profiles, the back-talking, "being mouthy," the irritability, withdrawal, and effect on school

---

[2]

We note that the Defendant was acquitted of all counts in the indictment pertaining to S.W. The Defendant was also acquitted of the remaining five counts of rape of a child, eleven counts of aggravated sexual battery, two counts of sale, loan or exhibition of material harmful to minors, and one count of indecent exposure in the indictment pertaining to T.B. For the remainder of this opinion, we consider only those counts for which he was convicted.

11

performance. She also stated that making a "false" allegation of rape, and then saying it was done for attention, is a "very normal part of a child who's been sexually abused." She stated that clinical depression is not caused by being grounded for the summer or missing a concert, which she termed situational depression. Ms. Shotz testified that she had based her diagnosis of T.B. on the history she had received from T.B.'s family, her medical records, the length of time T.B.'s symptoms displayed, and the fact that T.B. had no prior history of the behaviors before the beginning of the reported sexual abuse.

Charles Stanfield testified that he had known the Defendant for over twenty-one years. He explained that as both men are "shooter enthusiasts," a friendship grew from this mutual interest. He stated that the two men had made over ten trips across the United States together, staying in hotel rooms together for a week at a time. He testified that he and the Defendant would eat together every weekend. Mr. Stanfield stated that, in twenty-one years, he had never seen the Defendant look at a Playboy magazine, or do anything that had any context to sexual activity, including during their trips to Las Vegas.

Mr. Stanfield testified that the Defendant would bring people to Mr. Stanfield's shooting range and teach them to shoot for free, including T.B. at one point. He testified that the Defendant did it because he liked to help people. He agreed that the Defendant was a Madison County constable for a period of time and that he set up a qualification class for the constables. The Defendant also taught handgun carry permit classes and donated the money he made from the classes to the Tennessee Sports Foundation.

Chris Chism testified that he had known the Defendant for fifteen years and that he had never known the Defendant to be angry or sad. He described the Defendant as an honest and generous person with a good work ethic.

Linda Lott testified that she had known the Defendant for six years and that she and her family were good friends with him. She stated he had never done anything to make her or her children feel uncomfortable around him or feel like they could not trust him. She said her children never talked about being scared of him or ever felt that he was going to hurt them. Ms. Lott stated that the Defendant was "a part of [their] family."

Richard Lott testified he had known the Defendant "well" for seven or eight years. Mr. Lott said he was very protective of his children and that the Defendant had never done anything to make Mr. Lott feel uncomfortable about having his children around him. He stated that the "situation" did not seem to be in the Defendant's character.

Several other witnesses testified that they had known the Defendant for many years, and they knew him to be a good and honest person. Those witnesses who had children stated that the Defendant had never exhibited any inappropriate behavior around their children. The

12

witnesses testified to the Defendant's good character, work ethic, and trustworthiness.

The trial court considered the evidence presented, along with the presentence report, and imposed five year sentences for each of the ten attempted aggravated sexual battery convictions, a ten year sentence for the aggravated sexual battery conviction, and twenty-five year sentences for each of the eleven rape of a child convictions. The trial court ordered the sentences for the attempted aggravated sexual battery and rape of a child convictions to run concurrently, and the sentence for the aggravated sexual battery conviction to run consecutively, for a total effective sentence of thirty-five years in the Tennessee Department of Correction. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence presented at trial is insufficient to sustain his convictions; (2) the trial court erred when it refused to admit into evidence the mental health record of T.B.; (3) the trial court erred when it refused to sequester Lieutenant Stacy during the two victims' testimony; (4) the State improperly demonstrated that the vibrator was still operable on battery power during closing arguments; (5) the State improperly commented on the author of the jury questionnaire during jury selection; (6) the State improperly argued that Dr. Kennon was a "hired gun," and the closing argument was "inflammatory" and violated the Defendant's Sixth Amendment right to a fair trial; (7) the trial court improperly instructed the jury that "recklessly" was the *mens rea* of the indicted offenses; (8) the trial court improperly instructed the jury by charging the *mens rea* element in "disjunctive" form; (9) the trial court erred in imposing consecutive sentences; (10) the trial court failed to instruct the jury on the legal effect of the dismissed counts in the indictment; and (11) the trial court erred in placing the victim's medical records under seal and denying the Defendant the opportunity to review the records. Due to the similar nature of the Defendant's claims (4) and (6), as well as (7) and (8), we will combine them, respectively, and address them as two issues.

## A. Sufficiency of the Evidence

The Defendant contends that the evidence presented at trial was legally insufficient to convict him of any of the charges against him. The Defendant argues that the dates specified in the indictment for these crimes were not established at trial, and that the credibility of T.B. was "repeatedly impeached," rendering her testimony "unreliable and unbelievable[.]" The State counters that the evidence is sufficient to support the Defendant's convictions, and that the testimony presented the offenses sequentially, thereby establishing that the crimes occurred between the years 2007 and 2009. The State further argues that a reasonable jury could find that the testimony sufficiently established that the offenses occurred on the dates testified to by T.B. The State notes that, notwithstanding the

13

inconsistencies in T.B.'s testimony, the jury was free to accredit her testimony. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be

drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The evidence, viewed in the light most favorable to the State, included the victim's testimony that she spent the night at the Defendant's house on numerous occasions during 2007, 2008, and 2009. The victim testified that, during her over night stays, the Defendant established a routine with her. On those occasions, the Defendant washed her in the bathtub with a wash rag and used the wash rag to wash her genital area and her breasts. She stated that he would put his fingers inside of her vaginal lips when washing her genital area. The victim recalled that the Defendant touched her in the same way on fifteen different occasions and that she had documented a list of the dates when the touching occurred. We will address separately each of the counts for which the Defendant was convicted.

### 1. Rape of a Child

The Defendant was convicted of eleven counts of rape of a child. A conviction for rape of a child requires "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (2010). Tennessee Code Annotated section 39-13-501(6) and (7) defines sexual penetration as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body . . . ." There is sexual penetration, in a legal sense, if there is the "slightest penetration" of a female's sexual organ. *State v. Bowles*, 52 S.W.3d 69, 74 (Tenn. 2001). This includes the "outer folds" of the vagina. *Id.*

In count 3, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed rape of a child by the act of slight digital penetration of T.B.'s genitals by use of the Defendant's fingers covered with a washcloth, occurring on or about September 28, 2007. The evidence, considered in the light most favorable to the State, shows that on September 28, 2007, T.B. spent the night at the Defendant's house, and that the Defendant took her clothes off and put her in the bath. T.B. testified that while in the bath, the Defendant would wash her body and touch her breasts and private parts, touching inside the lips of her genitals. This is sufficient to convict the Defendant of rape of a child alleged in count 3.

In count 6, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed rape of a child by

15

the act of slight digital penetration of T.B.'s genitals by use of the Defendant's fingers covered with a washcloth, occurring on or about December 7, 2007. The evidence, considered in the light most favorable to the State, shows that on December 7, 2007, the Defendant gave the victim a bath and when he washed her, he "put his fingers and the wash rag inside the lips" of her genitals. This is sufficient to convict the Defendant of rape of a child alleged in count 6.

In count 8, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed rape of a child by the act of slight digital penetration of T.B.'s genitals by use of the Defendant's fingers covered with a washcloth, occurring on or about December 15, 2007. The evidence, considered in the light most favorable to the State, shows that on December 15, 2007, the Defendant took the victim's clothes off and gave the victim a bath. The victim testified that when he washed her in the bathtub, he "went inside the lips" of her genitals. This is sufficient to convict the Defendant of rape of a child alleged in count 8.

In count 11, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed rape of a child by the act of slight digital penetration of T.B.'s genitals by use of the Defendant's fingers covered with a washcloth, occurring on or about March 15, 2008. The evidence, considered in the light most favorable to the State, shows that on March 15, 2008, the Defendant "took [the victim's clothes off and put [her] in the bath and washed [her]," and the Defendant "[went] with his fingers in the washrag inside the lips" of her genitals. This is sufficient to convict the Defendant of rape of a child alleged in count 11.

In count 13, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed rape of a child by the act of slight digital penetration of T.B.'s genitals by use of the Defendant's fingers covered with a washcloth, occurring on or about March 21, 2008. The evidence, considered in the light most favorable to the State, shows that on March 21, 2008, the victim went to the Defendant's house after a hunting trip where the Defendant "took [her] clothes off and put [her] in the bathtub, washed [her]. He went inside the lips [of her genitals.]" This is sufficient to convict the Defendant of rape of a child alleged in count 13.

In count 15, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed rape of a child by the act of slight digital penetration of T.B.'s genitals by use of the Defendant's fingers covered with a washcloth, occurring on or about July 4, 2008. The evidence, considered in the light most favorable to the State, shows that on July 4, 2008, the victim spent the weekend at the Defendant's house and they shot fireworks at his house. She testified that during the evening, the Defendant "took [her] clothes off and sat [her] in the bathtub, and

16

washed [her] body. He went inside the lips [of her genitals.]" This is sufficient to convict the Defendant of rape of a child alleged in count 15.

In count 17, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed rape of a child by the act of slight digital penetration of T.B.'s genitals by use of the Defendant's fingers covered with a washcloth, occurring on or about August 9, 2008. The evidence, considered in the light most favorable to the State, shows that on August 9, 2008, the Defendant "took [her] clothes off, sat [her] in the bathtub, washed [her] body. [The Defendant] went inside the lips [of her genitals.]" This is sufficient to convict the Defendant of rape of a child alleged in count 17.

In count 19, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed rape of a child by the act of slight digital penetration of T.B.'s genitals by use of the Defendant's fingers covered with a washcloth, occurring on or about November 8, 2008. The evidence, considered in the light most favorable to the State, shows that on November 8, 2008, the victim went back to the Defendant's house after going hunting. At his house, the Defendant "took [her] clothes off and sat [her] in the bathtub. Then [the Defendant] wash[ed] [her] body. He went inside the lips [of her genitals.]" This is sufficient to convict the Defendant of rape of a child alleged in count 19.

In count 21, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed rape of a child by the act of slight digital penetration of T.B.'s genitals by use of the Defendant's fingers covered with a washcloth, occurring on or about November 15, 2008. The evidence, considered in the light most favorable to the State, shows that on November 15, 2008, the victim spent the weekend at the Defendant's house after going hunting. She testified that the same "bath thing" occurred: the Defendant took her clothes off, sat her in the bathtub, and washed her body. He went inside "the lips" of her genitals when washing her. This is sufficient to convict the Defendant of rape of a child alleged in count 21.

In count 27, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed rape of a child by the act of slight digital penetration of T.B.'s genitals by use of the Defendant's fingers covered with a washcloth, occurring on or about January 17, 2009. The evidence, considered in the light most favorable to the State, shows that on January 17, 2009, the victim was on a "juvenile deer hunt" with the Defendant. She testified that after the hunt, she drove with the Defendant back to his house, where the Defendant took her clothes off, sat her in the bathtub, and washed her body. He went inside "the lips" of her genitals when washing her. This is sufficient to convict the Defendant of rape of a child alleged in count 27.

17

In count 31, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed rape of a child by the act of slight digital penetration of T.B.'s genitals by use of the Defendant's fingers covered with a washcloth, occurring on or about March 7, 2009. The evidence, considered in the light most favorable to the State, shows that on March 7, 2009, the victim recalled that she had a "cheer[leading] competition" and she spent the night with the Defendant that night. She testified that while she stayed there, the Defendant took her clothes off, sat her in the bathtub, and washed her body. He went inside "the lips" of her genitals when washing her. This is sufficient to convict the Defendant of rape of a child alleged in count 31.

The evidence presented at trial, viewed in the light most favorable to the State, proved the required elements for eleven offenses of rape of a child. The Defendant is not entitled to relief.

## 2. Aggravated Sexual Battery

The jury convicted the Defendant of one count of aggravated sexual battery. This requires proof beyond a reasonable doubt that: (1) the Defendant had "unlawful sexual contact," which the Code defines as the intentional touching of intimate parts with the purpose of sexual arousal or gratification, with the victim; and (2) that the victim was less than thirteen years of age. T.C.A. §§ 39-13-501(6), -504(a)(1)-(4) (2009). Unlawful sexual contact, in turn, is defined as including:

> the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]

T.C.A. § 39-13-501 (2010).

In count 37, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed aggravated sexual battery by the act of touching T.B.'s buttocks at his residence, occurring on July 10, 2009, and/or July 11, 2009. The evidence, considered in the light most favorable to the State, shows that on July 10, 2009, and/or July 11, 2009, the victim recalled that she was in her bathing suit at the Defendant's house when she was stung by a bee on her "butt." The Defendant called T.B.'s mother, who told him to give her a Benadryl. T.B. recalled that the Defendant could not find any, and that he pulled her bathing suit aside and put his mouth on her buttocks, where the bee sting was. T.B. said it was the Defendant's lips that came into contact with her buttock. This is sufficient to convict the Defendant of aggravated sexual

battery as alleged in count 37. The Defendant is not entitled to relief.

### 3. Attempted Aggravated Sexual Battery

The jury also convicted the Defendant of ten counts attempted aggravated sexual battery, for which the State must prove that the Defendant acted with the intent to complete a course of action that would constitute aggravated sexual battery and that his conduct constituted a substantial step toward the commission of the offense. *See* T.C.A. § 39-12-101(a)(3) (2010). The Defendant's conduct does not constitute a "substantial step . . . unless [his] entire course of action is corroborative of the intent to commit the offense." *Id.* § 39-12-101(b).

In count 1, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed aggravated sexual battery by the act of touching T.B.'s breasts on August 11, 2007. The evidence, considered in the light most favorable to the State, shows that on August 11, 2007, the victim recalled that she spent the night at the Defendant's house while her parents went out and that she slept in the same bed as the Defendant. The victim testified that while they lay in bed together, the Defendant touched her breasts. This evidence is sufficient from which a jury could conclude that the Defendant committed the lesser-included offense of attempted aggravated sexual battery.

In count 2, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed aggravated sexual battery by the act of touching T.B.'s breasts on September 28, 2007 and/or September 29, 2007. The evidence, considered in the light most favorable to the State, shows that on September 28 or 29, 2009, the victim recalled that her parents went to the races and she spent the night at the Defendant's house. The victim testified that she slept in the same bed as the Defendant, and that her touched her breasts while they lay together. This evidence is sufficient from which a jury could conclude that the Defendant committed the lesser-included offense of attempted aggravated sexual battery.

In count 4, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed aggravated sexual battery by the act of touching T.B.'s breasts in October, 2007. The evidence, considered in the light most favorable to the State, shows that in October 2007, the victim recalled that she went on a "juvenile hunt" with the Defendant, and that she slept in bed with the Defendant at his house. She recalled that the "same thing" happened while they were in bed together; the Defendant "put his arms around [her]," and touched her breasts. This evidence is sufficient from which a jury could conclude that the Defendant committed the lesser-included offense of attempted aggravated sexual battery.

19

In count 5, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed aggravated sexual battery by the act of touching T.B.'s breasts on December 7, 2007, and/or December 8, 2007. The evidence, considered in the light most favorable to the State, shows that on December 7 or 8, 2007, the victim recalled that she and the Defendant went duck hunting together and then went "home" to his house. The victim testified that she slept in the Defendant's bed with him, in a "little cutoff t-shirt and underwear," and that the Defendant slept in his underwear. She testified that the Defendant touched her breasts while they were in bed. This evidence is sufficient from which a jury could conclude that the Defendant committed the lesser-included offense of attempted aggravated sexual battery.

In count 7, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed aggravated sexual battery by the act of touching T.B.'s breasts on December 15, 2007, and/or December 16, 2007. The evidence, considered in the light most favorable to the State, shows that on December 15 or 16, 2007, the victim recalled that she spent the night at the Defendant's house after they went hunting and that the sleeping arrangement was the "same," together in his bed, and that the Defendant "touched her breasts." This evidence is sufficient from which a jury could conclude that the Defendant committed the lesser-included offense of attempted aggravated sexual battery.

In count 10, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed aggravated sexual battery by the act of touching T.B.'s breasts on March 15, 2008, and/or March 16, 2008. The evidence, considered in the light most favorable to the State, shows that on March 15 or 16, 2008, the victim recalled that she participated in a hunter safety class and then went back to the Defendant's house. She testified that the sleeping arrangement was the same, she slept in the same cutoff t-shirt and underwear and the Defendant wore underwear, and the Defendant's "arm was around [her]," and he touched her breasts. This evidence is sufficient from which a jury could conclude that the Defendant committed the lesser-included offense of attempted aggravated sexual battery.

In count 18, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed aggravated sexual battery by the act of touching T.B.'s breasts on November 7 through 9, 2008. The evidence, considered in the light most favorable to the State, shows that on November 7 through 9, 2008, the victim recalled that she and the Defendant went hunting and then she spent the night at his house. The victim testified that she slept in the same bed as the Defendant, and she wore the cutoff t-shirt and underwear, and he wore underwear. She stated that the Defendant touched her breasts while they were sleeping. This evidence is sufficient from which a jury could conclude that the Defendant committed the lesser-included offense of

20

attempted aggravated sexual battery.

In count 26, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed aggravated sexual battery by the act of touching T.B.'s breasts on January 17, 2009, and/or January 18, 2009. The evidence, considered in the light most favorable to the State, shows that on January 17 or 18, 2009, the victim recalled that she went on a "juvenile hunt" with the Defendant and while they slept in the same bed, he touched her breasts. This evidence is sufficient from which a jury could conclude that the Defendant committed the lesser-included offense of attempted aggravated sexual battery.

In count 29, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed aggravated sexual battery by the act of touching T.B.'s breasts on February 28 through March 1, 2009. The evidence, considered in the light most favorable to the State, shows that on February 28 through March 1, 2009, the victim recalled that it was her mother's birthday and "we got a really big snow." The victim testified that she went with the Defendant to Max Warren's cabin to play in the snow, and then went back to the Defendant's house. She testified that the sleeping arrangement was the same and the Defendant touched her breasts. This evidence is sufficient from which a jury could conclude that the Defendant committed the lesser-included offense of attempted aggravated sexual battery.

In count 30, based upon the allegations in the indictment and the subsequent election of offenses by the State, the State alleged that the Defendant committed aggravated sexual battery by the act of touching T.B.'s breasts on March 7, 2009. The evidence, considered in the light most favorable to the State, shows that on March 7, 2009, the victim recalled that she spent the night at the Defendant's house while her parents went out and that she slept in the same bed as the Defendant. The victim testified that while they lay in bed together, the Defendant was wearing underwear and a t-shirt and touched her breasts. This evidence is sufficient from which a jury could conclude that the Defendant committed unlawful sexual contact with the victim's intimate parts and that the Defendant acted with the intent to commit unlawful sexual contact; thus, the evidence is sufficient to convict the Defendant of attempted aggravated sexual battery alleged in count 30.

The Defendant contends that the evidence does not establish the specific dates alleged in the indictments. We disagree. The State established that these events began in 2007 and continued until 2009, and questioned the victim about the dates of the incidents in sequential order, beginning with an incident on September 28, 2007, and concluding with an incident on March 7, 2009. As the Defendant points out, neither the State nor the victim specified the year for several of the incidents; however the month and day was always established; therefore, the jury, could reasonably infer the year of each incident, based on the sequence

of the years during which the events occurred.

The Defendant also contends that the victim's testimony was not credible and was impeached on multiple occasions. As we earlier noted, questions of credibility are left to the jury, and as evidenced by its verdict, the jury accredited the victim's testimony and her accounts of the multiple times the Defendant touched her genital area and breasts. *See Bland*, 958 S.W.2d at 659. We will not disturb the jury's verdict. The Defendant is not entitled to relief on this issue.

## B. Introduction of Victim's Mental Health Records Into Evidence

The Defendant next contends that the trial court erred when it refused to admit into evidence T.B's mental health record from a Pathways treatment facility. The Pathways record contained information about T.B.'s previous accusation of rape, made initially to her boyfriend. The State contends that T.B. admitted under oath that she had made the prior accusation, and, thus, there was "nothing for the [D]efendant to impeach." The State further contends that extrinsic evidence is inadmissible for impeachment, and, even assuming error, the exclusion of the medical record did not prejudice the Defendant. We agree with the State.

The admission of evidence is a matter within the trial court's discretion, and a decision to admit or exclude evidence will not be disturbed on appeal absent a clear abuse of that discretion. *State v. Carroll*, 36 S.W.3d 854, 867 (Tenn. Crim. App. 1999). Rule 401 of the Tennessee Rules of Evidence provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402.

Tennessee Code Annotated section 33-3-105 addresses the disclosure of confidential mental health records and states in relevant part:

Information that is confidential under § 33-3-103[3] may be disclosed without

---

[3]Section 33-3-103 states:

Confidentiality of mental health records.

All applications, certificates, records, reports, legal documents, and pleadings made and all information provided or received in connection with services applied for, provided under, or regulated under this title and directly or indirectly identifying a service recipient or

consent of the service recipient if:

(3) As a court orders, after a hearing, upon its determination that disclosure is necessary for the conduct of proceedings before it and that failure to make the disclosure would be contrary to public interest or to the detriment of a party to the proceedings[.]

This Court has held that mental health records governed by Section 33-3-103 are subject to *in camera* review. *See State v. Jeffrey R. Allen and Judge Jennings Michael Coen*, No. 03C01-9708-CC-00367, 1999 WL 5173, at *3-4 (Tenn. Crim. App., at Knoxville, Jan. 8, 1999), *no Tenn. R. App. P. 11 filed; State v. Brown*, 552 S.W.2d 383, 387 (Tenn. 1977).

At trial, the Defendant sought to introduce the mental health record as a self-authenticating document. The State objected on the grounds that a proper foundation could not be laid for the document, because the creator was not available to testify. The State also objected on the grounds that the document was not relevant. The trial court noted that it had reviewed T.B.'s mental health records *in camera* and disclosed to the Defendant any portion of them that it found "could possibly be relevant." The trial court sustained the State's objection to the introduction of the record on the grounds that the victim had testified about the portion of the record with which the Defendant sought to impeach her, and, thus, the evidence contained in the mental health record was "before this jury, in more than one form." The trial court also pointed out that the author of the document was not present in court to testify as to its foundation.

We disagree with the Defendant's contention that this was an abuse of the trial court's discretion. We have reviewed the sealed record and conclude that its introduction would be cumulative, in that the evidence contained in the sealed document which the Defendant sought to use to impeach the victim was already before the jury. The victim testified on direct examination that she told her boyfriend about the sexual abuse. She said that she did not reveal the Defendant's name, instead giving a "random" name. She stated that, when her school principal investigated her accusation, she told him she had made it up in order to avoid getting into trouble. On cross-examination, the victim confirmed her testimony on direct regarding her disclosure to her boyfriend and subsequent denial to her school principal. The victim agreed that she recanted, telling the principal that she had made the accusation to get attention and sympathy. The Defendant's counsel had ample opportunity to question the victim about her prior accusation, why she later recanted, and why she did not reveal the perpetrator's true identity. The mental health record the Defendant sought to introduce,

---

former service recipient shall be kept confidential and shall not be disclosed by any person except in compliance with this part.

which made note of this prior accusation, was not relevant to impeach the victim, as she was questioned at length about it by both the State and the defense. The trial court did not abuse its discretion when it sustained the State's objection to the introduction of the mental health record. The Defendant is not entitled to relief.

### C. Rule 615 Exclusion of Lieutenant Stacy

The Defendant contends that the trial court erred in refusing to "sequester" the State's designated witness, Lieutenant Stacy, during the victims' testimony, given the "central nature" of the victims' testimony to that of Lieutenant Stacy's. The Defendant further contends that, if Lieutenant Stacy as the State's designated witness was not going to be sequestered, Lieutenant Stacy should have testified first. The State responds that the Defendant cannot show that the trial court abused its discretion in refusing to exclude Lieutenant Stacy from the courtroom during the victims' testimony, and that the Defendant cannot point to prejudice suffered by him. We agree with the State.

Tennessee Rule of Evidence 615 provides that "[a]t the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing." The rule, however, does not authorize the exclusion of "a person whose presence is shown by a party to be essential to the presentation of the party's cause." Tenn. R. Evid. 615. Our Supreme Court summarized the law relating to sequestration as follows:

> The sequestration rule is designed to prevent witnesses from hearing the testimony of other witnesses and subsequently adjusting their testimony. *State v. Harris*, 839 S.W.2d 54, 68 (Tenn. 1992). When a sequestration rule violation is raised on appeal, the court shall consider the seriousness of the violation and the prejudice, if any, suffered by the defendant. *Id.* at 68-69.

*State v. Reid*, 164 S.W.3d 286, 342 (Tenn. 2005). When a prosecutor designates an investigating officer, that officer should testify first at trial to comply with the purpose of the rule, which is to prevent one witness from hearing the testimony of another and adjusting his testimony accordingly. *Mothershed v. State*, 578 S.W.2d 96, 100-01 (Tenn. Crim. App. 1978). When the State's designated witness does not testify first, a defendant must show that a witness improperly changed his or her testimony after hearing other witnesses testify. *State v. Sexton*, 724 S.W.2d 371, 374 (Tenn. Crim. App. 1986).

Placing witnesses under the sequestration rule or exempting them is within the sound discretion of the trial court. *State v. Taylor*, 645 S.W.2d 759 (Tenn. Crim. App. 1982). The trial court's decision will not be disturbed absent a showing that "such abuse worked to the prejudice of the complaining party." *Id.* (citing *McCravey v. State*, 455 S.W.2d 174 (Tenn. Crim. App. 1970)).

24

In this matter, when the trial court ordered all witnesses to be excluded from the courtroom, the State requested that Lieutenant Stacy be allowed to remain pursuant to Rule 615. The State contended that her presence as the lead detective in this case was "essential" to the presentation of its case. In ruling that Lieutenant Stacy would be allowed to remain in the courtroom, the trial court stated:

> The Court does note that there are 44 counts involved in this case. It's a substantial case as far as the number of counts, and I'm going to allow under the exception of 615 [Lieutenant Stacy] to remain and then ask the State to move as quickly as possible to get her on . . . . I believe that exception is permissible in my discretion.

The Defendant has failed to show that Lieutenant Stacy improperly changed her testimony after hearing S.W. and T.B. testify. The victims each testified to their encounters with the Defendant. Lieutenant Stacy testified regarding her interviews with the victims, the subsequent search of the Defendant's home, and the recovery of evidence. The Defendant has not offered any specific instance or example of testimony in support of his assertion that Lieutenant Stacy altered her testimony based on S.W. or T.B's testimony. The Defendant merely asserts that Lieutenant Stacy "conformed" her testimony to that of the victims, without showing any instances of the same throughout her testimony. Further, the Defendant has not identified the prejudice he suffered due to Lieutenant Stacy's presence during the first two witnesses' testimony, and our review of the record does not reveal any instance where Lieutenant Stacy improperly altered her testimony based on the testimony of the victims. Accordingly, we conclude that the Defendant has not shown that he was prejudiced, and he is not entitled to relief on this issue.

### D. State's Closing Argument

The Defendant contends that the State's closing argument was improper because: (1) the State demonstrated during the closing argument that the vibrator introduced as an exhibit at trial was still functioning on battery power, although the same had not been demonstrated when the vibrator was introduced through Lieutenant Stacy's testimony; and (2) the State argued that Dr. Kennon was a "hired gun," which was not a "proper fact of the case" and was inflammatory in violation of the Defendant's Sixth Amendment rights. The State responds that the demonstration of the vibrator was a "proper rebuttal to the [D]efendant's closing argument," and that, even assuming error in the demonstration, the jury was free to examine the vibrator during deliberations. The State also responds that the "hired gun" comment was in response to the Defendant's closing argument and was within the bounds of appropriate argument. The States further contends that, assuming error, the comment did not affect the verdict, as evidenced by the fact that the Defendant was acquitted of some charges and found

guilty of lesser-included offenses of other charges.

"Courts have recognized that closing argument is a valuable privilege afforded to the State and the defense and have afforded wide latitude to counsel in arguing their cases to the jury." *State v. Cleveland*, 959 S.W.2d 548, 551 (Tenn. 1997) (citing *State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn. 1994)). We have recognized five general areas of prosecutorial misconduct: (1) intentionally misstating the evidence or misleading of the jury on the inferences it can draw; (2) expressing personal beliefs or opinions; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) adding outside issues to the guilt or innocence issue; and (5) arguing or referring to outside facts. *State v. Goltz*, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003).

Tennessee Rule of Criminal Procedure 29.1(b) allows a closing argument to address any evidence introduced at trial. In addition to addressing the evidence, parties may also argue "reasonable inferences." *State v. Chico McCracken*, No. W2001-03176-CCA-R3-CD, 2003 WL 1618082, at *8 (Tenn. Crim. App., at Jackson, Mar. 24, 2003), *perm. app. denied* (Tenn. Sept. 2, 2003). When there is improper argument, the court must test whether the inflammatory statement negatively impacted the Defendant. To measure this impact, five factors should be considered: "(1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case." *Goltz*, 111 S.W.3d at 5-6. Curative measures by the court, such as proper jury instructions, will likely render the misconduct harmless. *McCracken*, 2003 WL 1618082, at *8. We review this issue under the abuse of discretion standard. *State v. Hall*, 976 S.W.2d 121, 157 (Tenn. 1998).

A point of consideration is whether an argument is made in response to a defendant's comment or argument. Rebuttal argument is limited to the subject matter covered in the State's opening argument and the defendant's intervening argument. Tenn. R. Crim. P. 29.1(b).

We note initially that the Defendant was acquitted of the charge of exhibition of material harmful to minors which was based upon the Defendant's alleged conduct of showing the vibrator to T.B. The vibrator at issue was introduced as an exhibit at trial, through the testimony of Lieutenant Stacy and the victim; the victim stated that the Defendant had asked her if she wanted to see the vibrator, and, when she declined, he put it back in the dresser, where it was later found by Lieutenant Stacy. Because the vibrator was introduced into evidence at trial, its use in closing arguments was proper. *State v. Sutton*, 562 S.W.2d 820 (Tenn. 1978). The Defendant's attorney, in his closing argument, argued that the victim had "been through everything" in the Defendant's house. He argued that the Defendant was grieving the death of his wife, and too distraught to "move her stuff,"

implying that the vibrator was hers.

In its rebuttal, the State sought to turn on the vibrator for the jury. The Defendant objected, and the following exchange occurred:

Counsel for State: [The Defendant] is arguing in a way – he's insinuating that [the vibrator] belonged to [his late wife], I would assume.

Counsel for Defendant: Objection to [a demonstration] he's about to do.

. . . .

State: It's a piece of evidence. It's been entered. The jury has a right to inspect evidence that's been entered.

. . . .

(Bench conference) Counsel for Defendant: Just as long as we're not turning [the vibrator] on to see if the battery still works, [the State] can do whatever [it] wants with it.

State: Why can't I?

Counsel for Defendant: Because it wasn't – is not the functionality of that – that is not in evidence, and there was no offer that it was still functioning period. Now we need a battery expert if we're. . . .

The Court: Overruled. Overruled.

Counsel for the State then argued to the jury that the vibrator was working, and demonstrated that it could be turned on, to rebut the Defendant's assertion that the vibrator was an old item that belonged to his late wife. At the motion for new trial, the trial court found that there was "no error [in the State's argument] under the circumstances, no improper argument made or impropriety found that would affect the jury verdict in this case." The trial court noted that the jury could have turned on the vibrator during deliberations, regardless of the State's demonstration.

In his closing argument, the Defendant questioned the age of the vibrator, and contended that it belonged to his late wife, who died in 2007, and the State sought to rebut the argument by demonstrating that the vibrator worked. We conclude that the Defendant raised the issue during his argument, and the State responded accordingly, addressing the subject matter raised by the Defendant. On that basis, the trial court ruled that the State's argument was not improper. We conclude that the trial court did not abuse its discretion.

Turning next to the Defendant's contention that the State's comment about Dr.

Kennon being a "hired gun" was improper, we similarly conclude that the trial court did not abuse its discretion in refusing to grant the Defendant a new trial on this basis. The jury heard Dr. Kennon's testimony and was free to reach its own conclusions in regard to the credibility of his testimony as an expert witness. The jury was instructed by the trial court that closing arguments are not evidence. Generally, we presume that a jury has followed the instructions of the trial court. *See State v. Butler*, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). An instruction to this effect was sufficient to cure any alleged prejudice suffered by the Defendant as a result of the State's comment. *State v. Broughton*, No. E2007-02533-CCA-R3-CD, 2009 WL 648933, at *14 (Tenn. Crim. App. March 13, 2009), *perm. app. denied* (Tenn. Aug. 17, 2012) (citing *McCracken*, 2003 WL 1618082, at *8). We conclude that the trial court did not abuse its discretion in this matter. The Defendant is not entitled to relief.

## E. Comment During Voir Dire

The Defendant contends that the State improperly commented to the prospective jury pool that the Defendant's counsel had authored the jury questionnaire; this, the Defendant argues, prejudiced the Defendant because the comment "disparage[d]" the defense attorney and prevented jurors from being able to fairly and impartially determine the outcome of the trial. The State responds that the Defendant made no objection during voir dire and thus should not be afforded appellate review, and, in any event, the State's remark was not disparaging. We agree with the State.

The Defendant complains of the following comment made by the State during voir dire:

> Okay. Good. Any of y'all know any reason why you could not be fair and impartial?

> Okay. And I appreciate you filling out Mr. Byrd's questionnaire. I have gone again through it and it is helpful. But this is my opportunity where I get to ask you a few questions.

The Defendant contends that the remark that the jury questionnaire had been authored by defense counsel was "disparaging," and "rebuke[d]" defense counsel, which "prevented the jurors from being able to fairly and impartially determine the defendant's guilt or innocence."

We first note that, as the State points out in its brief, the Defendant neither objected during voir dire after the comment was made, nor did he raise an objection outside the presence of the jury. Thus, the Defendant's failure to object waives this issue for appellate review. *See* Tenn. R. App. P. 36(a).

28

Even so, this Court has stated that an improper argument, or comment in this case, does not alone merit a new trial. *State v. Hill*, 333 S.W.3d 106, 130 (Tenn. Crim. App. 2010) (citing *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)). When argument is found to be improper, the established test for determining where there is reversible error is "whether the conduct was so improper or the argument so inflammatory that it affected the verdict to the [complaining party's] detriment." *State v. Williams*, No. M2005-00836-CCA-R3-CD, 2006 WL 3431920, at *21 (Tenn. Crim. App., at Nashville, Nov. 29, 2006), *no perm. app. filed* (citing *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003)). We conclude that the comment as to the author of the jury questionnaire was not "so improper" or "so inflammatory" such that it "affected the [jury's] verdict" in this case. In our view, the comment had no direct result on the outcome of the trial, and the Defendant has not shown that the State's comment was made with the "intent to provoke bias among the jurors." *State v. Robinson*, 146 S.W.3d 469, 520 (Tenn. 2004). Furthermore, the jury acquitted the Defendant of multiple charges, indicating that "the jury carefully considered the evidence and convicted the [Defendant] based upon the State's case, not upon the prosecutor's statements during voir dire." *State v. Swader*, No. M2005-00185-CCA-R3-CD, 2006 WL 287384, at *6-7 (Tenn. Crim. App., at Nashville, Feb. 6, 2006), *perm. app. denied* (Tenn. June 26, 2006). Therefore, the Defendant is not entitled to relief as to this issue.

### F. Jury Instructions

The Defendant contends that the trial court erred in giving its instructions to the jury. The State responds that the trial court provided the jury with proper instructions and did not mislead the jury as to the applicable law. A trial court has the duty, in criminal cases, to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. *See State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999); *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). "Nothing short of a 'clear and distinct exposition of the law' satisfies a defendant's constitutional right to trial by jury." *State v. Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee*, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987) (quoting *Strady v. State*, 45 Tenn. 300, 307 (1868)). In other words, the court must instruct the jury on those principles closely and openly connected with the facts before the court, which are necessary for the jury's understanding of the case. *Elder*, 982 S.W.2d at 876. Because questions of the propriety of jury instructions are mixed questions of law and fact, our standard of review here is *de novo*, with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

When reviewing jury instructions on appeal to determine whether they are erroneous, this Court should "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson*, 878 S.W.2d 530, 555 (Tenn. 1994)). The Tennessee Supreme Court, relying on the words of the United States Supreme

Court, has noted that:

> [J]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Id.* (quoting *Boyde v. California*, 494 U.S. 370, 380-81 (1990)). A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id.* (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531, 544 (Tenn. 1977)). Even if a trial court errs when instructing the jury, such instructional error may be found harmless. *State v. Williams*, 977 S.W.2d 101, 104-05 (Tenn. 1998).

### 1. Inclusion of "Recklessly" Language in Jury Charge

First, the Defendant contends the trial court erroneously instructed the jury that a finding of "recklessness" as to the Defendant's actions would suffice to establish his guilt for both rape of a child and aggravated sexual battery. We consider this complaint as to each offense in turn.

### a. Rape of a Child

The Defendant contends that the trial court erroneously instructed the jury that a finding of recklessness as to the element of "sexual penetration" would suffice to establish the Defendant's guilt of rape of a child. The Defendant argues the instruction was in error because recklessness only applies to the element of the age of the victim, and is not related to the Defendant's actions, which must be committed either knowingly or intentionally. The State responds that the instruction was not in error because rape of a child has the culpable mental state of intentionally, knowingly, or recklessly. The State further notes that its theory at trial was one of intentional penetration, not reckless penetration, and, thus, assuming error, the instruction did not affect the outcome of the case. We agree with the State.

Tennessee Code Annotated section 39-13-522 defines the offense of rape of a child as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (2010). Because the statutory definition of rape of a child does not plainly dispense with a mental element, "intentional," "knowing," or "reckless" conduct suffices to establish the culpable mental state. T.C.A. § 39-11-301(c) (2003); *see State v. Chester Wayne Walters*, No. M2003-03019-CCA-R3-CD, 2004 WL 2726034 (Tenn. Crim. App. at

30

Nashville, Nov. 30, 2004) (holding that, when considering the crime of rape of a child, a jury can find the defendant guilty by determining the defendant acted intentionally, knowingly, or recklessly when he unlawfully sexually penetrated the victim and with respect to the element that the victim is age thirteen or younger), *perm. app. denied* (Tenn. Mar. 21, 2005); *see also State v. Thomas D. Stricklin*, No. M2005-02911-CCA-R3-CD, 2007 WL 1028535, at * 15-18 (Tenn.Crim.App., at Nashville, Apr. 5, 2007), *perm. app. denied* (Tenn. Aug. 20, 2007). Moreover, the Committee on Pattern Jury Instructions "is of the opinion that the definitions of 'intentionally,' 'knowingly,' and 'recklessly' should all be charged for [the] offense [of rape of a child]." Comm. Pattern Jury Instructions Comts. to 10.12. Thus, each element of rape of a child may be met by proving the defendant acted intentionally, knowingly, or recklessly.

In Tennessee, there are four culpable mental states: intentionally, knowingly, recklessly, and criminally negligent. *See* T.C.A. § 39-11-302 (2006). If the statute defining the offense does not plainly dispense with a mental element, then "intent, knowledge, or recklessness suffices" to establish the culpable mental state. T.C.A. § 39-11-301(c); *State v. Page*, 81 S.W.3d 781, 786 (Tenn. Crim. App. 2002); *State v. Chester Wayne Walters*, No. M2003-03019-CCA-R3-CD, 2004 WL 2726034, at *12 (Tenn. Crim. App., at Nashville, Nov. 30, 2004), *perm. app. denied* (Tenn. Mar. 21, 2005). If the elements of an offense have distinctly varying *mens rea*, then the trial court must clearly instruct the jury about the mental state for each element. *State v. Howard*, 926 S.W2d 579, 587 (Tenn. Crim. App. 1996), *overruled on other grounds in State v. Williams*, 977 S.W.2d 101 (Tenn. 1998). "Each of these mental states is defined with reference to two or three of the following possible conduct elements: (1) nature of defendant's conduct, (2) circumstances surrounding the defendant's conduct, and (3) result of the defendant's conduct." *Page*, 81 S.W.3d at 787 (citing T.C.A. § 39-11-302). "'Intentional' refers to a person who acts intentionally with respect to the *nature* of the conduct or to a *result* of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. §39-11-302(a) (2006) (emphasis added). "'Knowing' refers to a person who acts knowingly with respect to the conduct or to *circumstances* surrounding the conduct when the person is aware of the *nature* of the conduct or that the *circumstances exist*." T.C.A. § 39-11-302(b) (2006) (emphasis added). A person can also act knowingly "with respect to a *result* of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. §39-11-302(b) (emphasis added). "'Reckless' refers to a person who acts recklessly with respect to *circumstances* surrounding the conduct or the *result* of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." T.C.A. §39-11-302(c) (2006) (emphasis added).

In this case, the record reflects that the trial court instructed the jury as follows with respect to the offense of rape of a child:

31

> For you to find the [D]efendant guilty of rape of a child, the State must have proven beyond a reasonable doubt the existence of the following essential elements: that the [D]efendant had unlawful sexual penetration of the alleged victim; and that the alleged victim was more than three (3) years of age but less than thirteen (13) years of age; and that the [D]efendant acted either intentionally, knowingly, or recklessly.

We conclude that the trial court's instruction on the offense of rape of a child fairly submitted the legal issues to the jury and its inclusion of recklessness as a *mens rea* sufficient to commit child rape did not mislead the jury. *See Hodges*, 944 S.W.2d at 352. As previously stated, recklessness is acceptable as a mental state for rape of a child, and the trial court instructed the jury accordingly. The Defendant is not entitled to relief on this issue.

### b. Aggravated Sexual Battery

The Defendant contends that the trial court also erred by instructing the jury that the State must prove that the Defendant "acted either intentionally, knowingly or recklessly" in committing the conduct element of aggravated sexual battery. The State responds that, because the trial court clearly explained the distinct *mens rea* requirements for the distinct elements of aggravated sexual battery, the trial court's jury instruction was not in error.

Tennessee Code Annotated section 39-13-504(a) defines aggravated sexual battery as "unlawful sexual contact with a victim by the defendant" where the victim is less than thirteen years of age. T.C.A. § 39-13-504(a)(4) (2010). The various elements of aggravated sexual battery contain distinct culpable mental states. "Sexual contact" must be accomplished "intentionally" with "the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6) (2003). Because the statute is silent as to the culpable mental state as to the victim's age, a showing of recklessness suffices to establish a defendant's culpability as to the victim's age. T.C.A. § 39-11-301(c); *State v. Howard*, 926 S.W.2d 579, 587 (Tenn. Crim. App. 1996), *overruled on other grounds in State v. Williams*, 977 S.W.2d 101 (Tenn. 1998). Where the *mens rea* requirements for an offense's elements vary, a trial court has a duty to set forth the mental state for each element clearly so the jury can determine whether the State has met its burden of proof. *Id*.

In this case, the record reflects that the trial court instructed the jury with respect to the offense of aggravated sexual battery as follows:

> For you to find the [D]efendant guilty of aggravated sexual battery, the State must have proven beyond a reasonable doubt the existence of the following essential elements: One, that he had unlawful sexual contact with the alleged victim, in which the [D]efendant intentionally touched her intimate

parts or the clothing covering the immediate area of her intimate parts; and that two, [the victim] was less than thirteen years of age; and three, that he acted either intentionally, knowingly or recklessly.

We cannot agree with the Defendant that the trial court's instructions misled the jury as to the culpable mental states required for the offense of aggravated sexual battery. This Court has previously upheld nearly identical instructions issued for the offense of aggravated sexual battery. *See Walters*, 2004 WL 2726034, at *13-14. In this case, as in *Walters*, the trial court clearly explained that the element of "sexual contact" must have been committed intentionally, with the specific purpose of deriving sexual arousal or gratification. As such, the trial court satisfied its duty of clearly setting forth the mental state for each element of the offense of aggravated sexual battery. *See Howard*, 926 S.W.2d at 587. Thus, the trial court did not mislead the jury when it included in the jury instruction the *mens rea* of "recklessness," which was the necessary culpable mental state for the age of the victim. *See Walters*, 2004 WL 2726034 at *14. The Defendant is not entitled to relief on this issue.

### c. Attempted Aggravated Sexual Battery

The Defendant contends that the trial court also erred by instructing the jury that the State must prove that the Defendant "acted either intentionally, knowingly or recklessly" in committing the conduct element of attempted aggravated sexual battery. The State responds that, because the trial court clearly explained the distinct *mens rea* requirements for the distinct elements of aggravated sexual battery, the trial court's jury instruction was not in error.

As we have stated, aggravated sexual battery is the "unlawful sexual contact with a victim by the defendant" when the victim "is less than thirteen (13) years of age." T.C.A. § 39–13–504(a)(4) (2010). Attempted aggravated sexual battery requires proof that the defendant acted with the intent to complete a course of action that would constitute aggravated sexual battery and that his conduct constituted a substantial step toward the commission of the offense. *See* T.C.A. § 39-12-101(a)(3) (2010). The defendant's conduct does not constitute a "substantial step . . . unless [his] entire course of action is corroborative of the intent to commit the offense." *Id.* § 39-12-101(b).

In this case, the record reflects that the trial court instructed the jury with respect to the offense of aggravated sexual battery as follows:

For you to find [the Defendant] guilty of criminal attempt, the [S]tate must have proven beyond a reasonable doubt the existence of the following essential elements: that the [D]efendant intended to commit the specific offense of aggravated sexual battery; and that the [D]efendant did some act or caused

33

something to happen that would have constituted aggravated sexual battery if the [D]efendant's beliefs at the time *he* acted had in fact been true; or that the [D]efendant did some act intending to cause an essential element of aggravated sexual battery to occur, and at the time believed the act would cause the element to occur without further action on the [D]efendant's part; or that the [D]efendant did some act intending to complete a course of action or cause a result that would constitute aggravated sexual battery under the circumstances, as the [D]efendant believed them to be at the time, and *his* actions constituted a substantial step toward the commission of aggravated sexual battery. The [D]efendant's actions to do not constitute a substantial step unless the [D]efendant's entire course of action clearly shows *his* intent to commit aggravated sexual battery. (Emphasis in original).

The jury charge used by the trial court was identical to the pattern jury charge on criminal attempt. T.P.I.-Crim. 4.01. In *State v. Eldridge*, this Court approved the language in the pattern jury instruction, as the instruction "expressly includes the defendant's intent to commit the specific offense as an essential element." 951 S.W.2d at 779. We conclude that this was the proper instruction for the trial court to give to the jury on the lesser-included offense of attempted aggravated sexual battery. The Defendant is not entitled to relief.

## 2. Disjunctive Use of "Or" in the Jury Charge on *Mens Rea*

Second, the Defendant contends the trial court erroneously used the disjunctive "or" in its charge to the jury, which permitted the jury to reach a non-unanimous verdict, violating the Defendant's constitutional right to a unanimous verdict. He argues that the trial court's instruction stating that the Defendant could be convicted if the evidence showed that he acted "intentionally, knowingly, **or** recklessly" erroneously charged the jury in the disjunctive. The State responds that charging *mens rea* in the disjunctive does not violate a defendant's right to a unanimous verdict.

Under Tennessee law, a defendant has a constitutional right to a unanimous verdict before a conviction for a criminal offense may be imposed. *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993); *State v. Brown*, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991). Protection of this right often requires "special precautions [by the court] to ensure that the jury deliberates over the particular charged offense, instead of creating a 'patchwork verdict' based on different offenses in evidence." *Id.* at 134. In *State v. Hood*, the Court of Appeals addressed unanimous jury verdicts in the context of multiple culpable mental states. 221 S.W.3d 531, 547 (Tenn. Ct. App. 2006). We concluded that the use of the word "or" when listing the alternative culpable mental states for the offense of aggravated rape did not violate constitutional protections against non-unanimous jury verdicts. *Id.* at 547-48. Moreover, this Court has stated, "Generally, alternative theories, mental states, modes of committing the

crime, or means by which the crime was committed may be submitted to the jury without the necessity of precautions to assure jury unanimity." *State v. James Clayton Young, Jr.*, No. 01C01-9605-CC-00208, 1998 WL 258466, at *5 n.4 (Tenn. Crim. App., at Nashville, May 22, 1998), *no Tenn. R. App. P. 11 application filed*.

In this case, as mentioned above, when the trial court defined the elements of aggravated sexual battery and rape of a child to the jury, it instructed the jury that the Defendant must have acted "either intentionally, knowingly or recklessly." We cannot agree with the Defendant that the disputed jury instruction violated his right to a unanimous verdict. The use of language allowing for differing conclusions among jurors as to a defendant's exact *mens rea* does not violate a defendant's right to a unanimous jury verdict. *See Hood*, at 547-48; *Young*, 1998 WL 258466, at *5 n. 4. As long as the jury unanimously determines that the defendant possessed a *mens rea* required for the alleged crime, the defendant's right to a unanimous verdict is not violated. As such, we conclude that the jury instructions in this case were proper. The Defendant is not entitled to relief on this issue.

### 3. Instruction related to the Acquitted Offenses

Third, the Defendant contends that the trial court erred by failing to instruct the jury about the legal effect of the counts in the indictment for which the Defendant was acquitted. The State responds that the Defendant neither raised an objection nor proposed a special jury instruction at trial, and the Defendant did not raise this issue in his motion for new trial. Thus, the State contends that the Defendant has waived appellate review of this issue. The State notes that, even so, our Supreme Court recently decided that a trial court is not required to instruct the jury on the counts in the indictment for which the accused is acquitted. We agree with the State.

Our Supreme Court recently decided a case of first impression holding that, when a defendant is acquitted of select charges in the indictment:

> [I]t is sufficient for the trial court to inform the jury that the dismissed charges have been removed from the indictment, that no instruction concerning the dismissed charges will be provided, and that the jury should not speculate as to the removal of the dismissed charges or the absence of instructions on the dismissed charges. The trial court, if requested to do so, should also provide an appropriate limiting instruction as to the purpose of the evidence related to the dismissed charges.

*State v. Little*, 402 S.W.3d 202, 215 (Tenn. 2013). Here, the trial court instructed the jury that the Motion for Judgment of Acquittal would be granted regarding multiple counts of the indictment. The trial court stated that neither the indictments nor the verdict forms would

35

be renumbered, and stated "[t]hose counts are coming out[.]" This was sufficient instruction to the jury. *See Little*, 402 S.W.3d at 215. The Defendant is not entitled to relief on this issue.

## G. Consecutive Sentencing

The Defendant contends that the trial court erred when it imposed consecutive sentences pursuant to Tennessee Code Annotated section 40-35-115(b)(2) and (5). The State responds that the record supports the trial court's imposition of consecutive sentences. We agree with the State.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. As it relates to this case, the trial court found the following criteria applicable:

. . .

(2) The defendant is an offender whose record of criminal activity is extensive;

. . .

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

. . . .

T.C.A. § 40-35-115(2) and (5). The criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. *See id.*; *State v. Denise Dianne Brannigan*, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *19 (Tenn. Crim. App., at Knoxville, June 13, 2012), *no Tenn. R. App. P. 11 application filed*. The imposition of consecutive sentencing, however, is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed [.]" T.C.A. § 40-35-103(2), (4). We review a trial court's decision to impose consecutive sentences for an abuse of discretion with a presumption of reasonableness. *State v. James Allen Pollard*, __ S.W.3d __, No. M2011-0032-SC-R11-CD

36

(Tenn. Dec. 20, 2013).

At the sentencing hearing, the trial court noted that it had considered the evidence presented at trial and the sentencing hearing, as well as the presentence report, the principles of sentencing, arguments of counsel, and the mitigating and enhancement factors. The trial court applied the mitigating factor that there was no serious bodily injury to the victim, pursuant to Tennessee Code Annotated section 40-35-113(1). The trial court found, as an enhancement factor pursuant to Tennessee Code Annotated section 40-35-114(14), that the Defendant abused a position of private trust. On the issue of consecutive sentenceing, the trial court stated that it had "considered very carefully the arguments of counsel, the evidence in this case, [and] the entire record" in making its decision. The trial court found that it had been proven by a preponderance of the evidence that the Defendant had an "extensive" record of criminal activity. The trial court further stated that it found by a preponderance of the evidence that the Defendant had been "convicted of two or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstance arising from the relationship between the Defendant and the victim[.]" The trial court also considered the time period of the undetected sexual activity, the nature and scope of the sexual acts, and the extent of the residual mental damage to the victim.

Based on those considerations, the trial court imposed concurrent sentences of twenty-five years for each of the rape of a child convictions; concurrent five year sentences for each of the attempted aggravated sexual battery convictions; and a ten year sentence for the aggravated sexual battery conviction. The trial court ordered partial consecutive sentencing, imposing a total effective sentence of thirty-five years to be served at 100% as mandated by law.

The trial court properly concluded based on the numerous convictions resulting from this indictment that the Defendant's record of criminal activity was extensive. This position is supported by *State v. Jones*, W2010-01080-CCA-R3-CD, 2011 WL 2162986 (Tenn. Crim. App. May 26, 2011), *perm. app. denied* (Tenn. Sept. 21, 2011) (holding that current offenses may be used in determining criminal history for sentencing purposes).

We agree with the trial court that the Defendant was convicted of two or more statutory offenses involving sexual abuse of a minor and that several aggravating circumstances listed in section 40-35-115(b) were present. The sexual abuse by the Defendant of the victim went on for a period of approximately two years, during which time the Defendant acted in the role of a caretaker for the victim and was considered by her to be a member of her family. A social worker who treated the victim testified that the victim suffered residual effects from the abuse, including fear, distrust, and feeling unsafe in her daily environment. The evidence did not preponderate against the trial court's findings that factor (5) was applicable here. Thus, we conclude that the trial court did not abuse its

discretion in imposing consecutive sentencing. The Defendant is not entitled to relief on this issue.

## H. Mental Health Records Placed Under Seal

Lastly, the Defendant contends that the trial court erred when it reviewed T.B.'s mental health records *in camera* and placed those records under seal. The Defendant argues that in order for him to exercise his constitutional right to present a defense, the records must have been made available to him and to his expert witnesses. He asserts that denying him access to these records compromised his due process and Sixth Amendment rights. The State counters that the law of this state is that "*in camera* review is the appropriate avenue for review of otherwise confidential medical and mental health records." The State asserts that this Court must review the records and determine whether the judgment of the trial court was correct.

In ruling on the disclosure of the psychiatric records of a prosecuting witness, our Supreme Court addressed the issue of a defendant's right to cross-examine witnesses, stating the following:

> The Sixth Amendment to the U.S. Constitution, which is applicable to the States through the Fourteenth Amendment, *see Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The corresponding provision of the Tennessee Constitution provides "[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." Tenn. Const. art. I, § 9. Although the language is not identical, this Court has previously adopted the standards of the U.S. Supreme Court under the Sixth Amendment in determining whether there has been a violation of the confrontation clause of Article I, § 9. *State v. Armes*, 607 S.W.2d 234, 237 (Tenn. 1980).

> The confrontation clause of the Sixth Amendment provides two types of protection for criminal defendants: the right to physically face those who testify against him, and the right to cross-examine witnesses. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40, 53 (1987). The right to cross-examine witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony. *Id.*, 480 U.S. at 53, 107 S.Ct. at 999, 94 L.Ed.2d at 54. Therefore, the right to confront witnesses is satisfied if defense counsel receives wide latitude at trial to cross-examine, because the confrontation clause only guarantees "an opportunity for effective

cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15, 19 (1985)).

*State v. Middlebrooks*, 840 S.W.2d 317, 332-33 (Tenn. 1992). The Court in *Middlebrooks* held that to ensure a defendant's right to cross-examine is not denied, trial courts should review psychiatric records of witnesses *in camera* to determine if the records are relevant in determining the veracity of a witness. *Id.* at 333. In *Middlebrooks*, the trial court's failure to review the records as required was held to be harmless error because a review of the sealed records revealed that they contained very little information probative on the issue of the witness's credibility. *Id.*

In the present case, the trial court properly reviewed the psychological records of T.B. and determined that the records need not be disclosed to the defense, as the information contained therein was already before the jury through more than one witnesses' testimony, primarily T.B.'s testimony. Having reviewed the psychological records, this Court agrees that the records need not be disclosed. As we have previously stated, T.B. testified at length about her prior accusation of rape, and defense counsel had ample opportunity to cross-examine her about her statements. T.B.'s school principal also testified about T.B.'s prior allegation and his conversations with her. The records contain nothing exculpatory beyond that which was testified to, that T.B. made a prior accusation of rape in the past. Our standard of review in this evidentiary issue is abuse of discretion. *See Carroll*, 36 S.W.3d at 867. As such, we conclude that the trial court did not abuse its discretion when it declined to disclose the records to the Defendant. The Defendant is not entitled to relief.

### III. Conclusion

After a thorough review of the record and applicable law, we conclude that the evidence supports the Defendant's convictions, that the trial court did not err in the admission and exclusion of evidence, closing arguments were not improper, and that the trial court properly instructed the jury. Accordingly, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE